ANDRÉ BIROTTE JR.
United States Attorney
ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division
California Bar Number: 167358
    1200 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone No. (213) 894-4685
    Facsimile No. (213) 894-3713
    E-Mail: robert.dugdale@usdoj.gov

Attorneys for Plaintiff
UNITED STATE OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,           )    No. CR 07-134-DDP
                                    )
              Plaintiff,            )    GOVERNMENT'S SENTENCING POSITION
                                    )    REGARDING THE SENTENCING OF
              v.                    )    DEFENDANT JAMES RAY HOUSTON AND
                                    )    RESPONSE TO DEFENDANT HOUSTON'S
JAMES RAY HOUSTON,                  )    SENTENCING PAPER
                                    )
                                    )    Sentencing Date:    8/1/11
              Defendant.            )    Time:            1:30 p.m.
_____)
                                         [Courtroom of the Honorable Dean
                                         D. Pregerson]

**TABLE OF CONTENTS**

Table of Authorities . . . . . . . . . . . . . . . . . ii

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . 1

II.   PERTINENT FACTS . . . . . . . . . . . . . . . . 2

      A.    THE MASSIVE FRAUDULENT SCHEME AT ISSUE IN THIS CASE . 2

      B.    THE MULTITUDE OF AGGRAVATING FACTS RELATING TO
            DEFENDANT HOUSTON'S INVOLVEMENT IN THE MASSIVE
            FRAUDULENT SCHEME AT ISSUE IN THIS CASE . . . . . . 5

            1.    Defendant Houston Was the Leader and
                  Organizer of an Extensive Criminal
                  Conspiracy . . . . . . . . . . . . . . 5

            2.    The Victims in this Case Number in the
                  Thousands, If Not the Tens of Thousands,
                  Were Repeatedly Victimized, and Were Vulnerable
                  Victims Who Defendant Houston and His Co-
                  conspirators Ruthlessly Exploited . . . . . . 6

            3.    The Losses Attributable to the Massive
                  Scheme Led By Defendant Houston Were
                  Astronomical . . . . . . . . . . . . . 8

III.  THE SENTENCING GUIDELINE CALCULATIONS . . . . . . . . 10

IV.   ARGUMENT . . . . . . . . . . . . . . . . . . . 11

      A.    A SENTENCE OF AT LEAST 120 MONTHS IS APPROPRIATE
            IN THIS CASE UPON CONSIDERATION OF THE FACTORS
            CITED UNDER 18 U.S.C. § 3553(a . . . . . . . . . 11

            1.    A Sentence of at Least 120 Months Is
                  Warranted to Reflect the Nature and
                  Seriousness of Defendant Houston's Offense . . 12

            2.    An Examination of the History and
                  Characteristics of Defendant Houston Favors
                  the Imposition of a Sentence of at Least
                  120 Months . . . . . . . . . . . . . . 12

            3.    The Advisory Sentencing Guidelines Support
                  a Sentence of Greater than 120 Months . . . . 14

i

4.   A Sentence of at Least 120 Months Would
     Also Serve the Statutory Goals of Providing
     General Detterence, Adequate Detterance, and
     Protecting the Public from Further Harm  . . .  15

B.   DEFENDANT'S SINGLE OBJECTION TO THE SENTENCING
     GUIDELINE CALCULATION OFFERED BY THE PROBATION
     OFFICE IS WITHOUT MERIT . . . . . . . . . . . .  16

C.   THE MITIGATING FACTS RELIED UPON BY DEFENDANT
     HOUSTON IN HIS SENTENCING BRIEF DO NOT JUSTIFY
     SLASHING DEFENDANT HOUSTON'S SENTENCE TO
     ONE-THIRD THE SENTENCE RECOMMENDED BY THE
     PROBATION OFFICE IN THIS CASE . . . . . . . . .  17

     1.   Defendant Houston's "History and
          Characteristics" Do Not Justify a Sentence
           of 51 Months  . . . . . . . . . . . . .  17

     2.   Defendant Houston's Medical Issues Do Not
          Justify the Sentence He Advocates  . . . . .  18

     3.   Defendant Houston is Not Entitled to a
          Massive Sentencing Reduction to Account
          for the Sentences the Lesser Culpable
          Co-Schemers in this Case Received  . . . . .  21

V. CONCLUSION . . . . . . . . . . . . . . . . . . . . . .  23

# TABLE OF AUTHORITIES

**FEDERAL CASES**

United States v. Booker,
543 U.S. 220 (2005) . . . . . . . . . . . . . . . . . 11, 14

United States v. Cantrell,
433 F.3d 1269 (9th Cir. 2006) . . . . . . . . . . . . 14

United States v. Carr,
271 F.3d 172 (4th Cir. 2001) . . . . . . . . . . . . 20

United States v. Endicott,
803 F.2d 506 (9th Cir. 1986) . . . . . . . . . . . . 21

United States v. Johnson,
318 F.3d 821 (8th Cir. 2003) . . . . . . . . . . . . 20

United States v. Lujan,
324 F.3d 27 (1st Cir. 2003) . . . . . . . . . . . . 19

United States v. Martinez-Guerrero,
87 F.2d 618 (9th Cir. 1992) . . . . . . . . . . . . 9, 19

United States v. Monroe,
943 F.2d 1007 (9th Cir. 1991) . . . . . . . . . . . 21

United States v. Saeteurn,
504 F.3d 1175 (9th Cir. 2007) . . . . . . . . . . . 22

United States v. Tyler,
125 F.3d 1119 (7th Cir. 1997) . . . . . . . . . . . 20

**FEDERAL STATUTES**

18 U.S.C. § 3553(a)  . . . . . . . . . . . . . 2, 11, 19, 22

# I.

## INTRODUCTION

Defendant James Ray Houston ("defendant Houston") has pled guilty to one count of mail fraud resulting from his involvement in a scheme that defrauded many thousands of victims through the establishment and operation of fraudulent lottery and pension companies.  From approximately 1990, until at least July 2006, the fraudulent companies operated and controlled by defendant Houston and his co-schemers mailed over one million letters to victims in the United States and Canada, inviting them to send in money that would purportedly be played in foreign lotteries or invested in pension funds that would yield life insurance and retirement benefits.  In fact, no money sent by the victims in response to these solicitations was ever used for the purchase of lottery tickets or invested in pension accounts; rather, the funds were transferred through a series of bank accounts established at the direction of defendant Houston and his co-schemers and were used to pay the expenses needed to run the scheme and to line the pockets of defendant Houston and his co-conspirators.  Checks for small amounts -- far less than the amounts the victims sent in -- were sent to some victims and represented as "winnings" in order to induce their further participation (and victimization) in the scheme.

Defendant Houston played a leading role in the massive scheme at issue in this case -- which claimed many thousands of victims, including many vulnerable victims, who lost, in total, at least $20 million as a result of this scheme.  Defendant Houston was involved in the scheme since its inception,

1   participated in the scheme for at least 16 years, participated in
2   editing and writing some of the fraudulent solicitation letters
3   at issue in the case, and helped supervise an entire network of
4   individuals who printed and mailed these fraudulent letters.

5        In its Presentence Report ("PSR"), the Probation Office has
6   recommended that defendant Houston be sentenced to 151-months in
7   custody, a term of imprisonment at the low end of the Sentencing
8   Guidelines range it has calculated.  In his sentencing position
9   paper, defendant Houston is seeking a sentence approximately one-
10  third of that recommended by the Probation Office, asserting that
11  the leading role he played for sixteen years in a massive fraud
12  scheme that victimized tens of thousands of people is deserving
13  of a 51-month sentence.  For the reasons set forth fully below,
14  the government respectfully submits that consideration of the
15  factors set forth at 18 U.S.C. § 3553(a) -- including the
16  unquestioned seriousness of the instant offense -- justifies the
17  imposition of a sentence of at least 120 months imprisonment.

18                              II.

19                        PERTINENT FACTS

20  A.   THE MASSIVE FRAUDULENT SCHEME AT ISSUE IN THIS CASE

21       Beginning in about 1990, until at least July 2006, defendant
22  Houston and his co-conspirators operated a scheme in which
23  portions of companies they owned or controlled purported to, for
24  a fee, enter individuals in the United States into foreign and
25  domestic lotteries, and to set up pension accounts.  Houston and
26  his co-conspirators operated their scheme under various names,
27  including "World Expert," "Shamrock Agency," "Old Amsterdam
28  Trust," "Mutual Medical Insurance Trust," "EU Fulfillment

                              2

1  Commission," "Gernam Swiss Group," "Euro American Fax," and
2  "Global Search Network," all of which were fraudulent lottery and
3  pension companies.

4      These fraudulent lottery and pension companies that
5  defendant Houston operated mailed over one million letters to
6  victims in the United States and Canada, inviting them to send in
7  money that would be played in lotteries such as the "Australian
8  Lottery" and the "International Irish Sweepstakes."  The mailings
9  also claimed that the victims' money would be grouped together,
10 or "pooled," to buy larger blocks of lottery tickets.  These
11 mailings led the victims to believe that they might win
12 considerable amounts of money, or receive a large lump sum payout
13 in the form of a "pension."  In fact, there were no pension
14 accounts for the victims, and victims would not be paid as
15 promised.

16     Occasionally, the fraudulent lottery and pension companies
17 did pay supposed "winnings" to victims.  However, these
18 "winnings" were far less than the amount that the victims had
19 paid to defendant Houston and his co-conspirators.  In fact, when
20 defendant Houston and his co-conspirators sent "winnings" to the
21 victims in the case, they usually also included a request to make
22 further lottery purchases.  The victims made payments to
23 defendant Houston and his co-conspirators by depositing money in
24 the accounts in the names of the fraudulent lottery and pension
25 companies by check, money order, and credit card, and they
26 usually mailed these payments through the United States Postal
27 Service.

28     The investigation in this case has confirmed that defendant

1   Houston and his co-conspirators never purchased tickets for the
2   lotteries that were advertised to the victims.  Specifically, an
3   extensive analysis of voluminous bank records obtained in this
4   case show the flow of the money paid by the victims, and this
5   analysis has confirmed that no lottery tickets were purchased by
6   defendant Houston or any of his co-conspirators.  Instead, victim
7   money went into one series of bank accounts, from which it was
8   transferred into another series of accounts, out of which
9   "winning" checks were written, and then what was left was
10   transferred to still other accounts, which were used to pay
11   expenses to operate the scheme and dole out profits to those
12   operating the scheme, including defendant Houston.
13       The modus operandi of the scheme was to send letters with
14   printing and mailing instructions from Costa Rica to printing and
15   mailing houses in the United States.  These lottery letters would
16   then be mailed from the printing and mailing houses in the United
17   States to potential victims.  The letters were initiated by
18   defendant Houston, his co-defendant Dennis Emmett, and others in
19   Costa Rica.  The mailings included pre-addressed envelopes from
20   the victims that were designed to allow the victims to mail
21   checks to addresses in Ireland and the Netherlands.  The
22   mailboxes in Ireland and the Netherlands were monitored and
23   controlled by co-conspirators acting on behalf of defendant
24   Houston and his criminal partners.  Defendant Houston's
25   co-conspirators picked up the checks in Ireland and the
26   Netherlands and then forwarded them to California and Costa Rica,
27   where they would be deposited and be available to defendant
28   Houston and his co-conspirators.

4

B.   THE MULTITUDE OF AGGRAVATING FACTS RELATING TO DEFENDANT
     HOUSTON'S INVOLVEMENT IN THE MASSIVE FRAUDULENT SCHEME AT
     ISSUE IN THIS CASE

     There are a multitude of aggravating facts that justify
the punishment recommended by the Probation Office and the
Sentencing Guideline calculation computed by the Probation
Office, including (1) the fact that the evidence shows that
defendant Houston was an organizer of the criminal conduct at
issue in this case and has consistently been identified as the
most culpable of the defendants charged in this massive fraud
scheme; (2) aggravating facts concerning the victims in this
case, including the fact that they were solicited numerous times,
that they were vulnerable, and that they number in the tens of
thousands; and (3) the tremendous financial losses attributable
to the massive fraudulent enterprise that defendant Houston
directed.

     1.   Defendant Houston Was the Leader and Organizer of an
          Extensive Criminal Conspiracy

     Defendant Houston was an organizer of the criminal conduct
at issue in this case, as he directed the activities of at least
five other people, as well as people who worked for these
individuals.  Specifically, at least prior to the time that
defendant Sonny Vleisides ("Vleisides") split his operations from
defendant Houston's operations, individuals who have provided
information to the government in this case have confirmed that
defendant Houston directed the activities of William Cloud
("Cloud"), Henry Walther ("H. Walther"), Dennis Emmett
("Emmett"), Vleisides, and others.  Those individuals, in turn,
directed and supervised the activities of people below them in

1   this case.

2        Consistent with defendant Houston's role as a leader of the

3   massive scheme at issue in this case is the fact that he was one

4   of the initial creators of the scheme, and, with his

5   participation in the scheme spanning approximately 16 years, he

6   participated in the scheme as long or longer than any of his

7   coconspirators.  In addition, cooperating witnesses in this case

8   have identified specific acts that defendant Houston performed as

9   a leader and organizer of the scheme, such as serving as the

10  author of many of the promotional letters that were used to snare

11  the victims in this case and diverting money received as a result

12  of participation in the scheme to personal projects that

13  defendant Houston ran in Costa Rica.  Indeed, the attorney who

14  controlled the bank accounts and the movement of the money in

15  this case -- Henry Walther - specifically identified defendant

16  Houston, defendant Emmett, and defendant Vleisides as the three

17  individuals who provided him with instructions relating to the

18  laundering of the fraudulent proceeds accumulated as a result of

19  this massive scheme.

20       2.   <u>The Victims in this Case Number in the Thousands, If
              Not the Tens of Thousands, Were Repeatedly Victimized,</u>
21            <u>and Were Vulnerable Victims Who Defendant Houston and
              His Co-conspirators Ruthlessly Exploited</u>

22       While it is not possible to pin down exactly how many

23  victims were victimized by the fraud perpetrated by defendant

24  Houston and his co-schemers, because it is not possible to

25  determine the number of victims who lost money by paying cash

26

27

28

                                   6

1  into the scheme,[1] it is safe to estimate that defendant Houston's
2  scheme victimized many thousands of victims.  Indeed, a review of
3  bank accounts that the government obtained and subpoenaed during
4  the investigation of the massive fraud scheme at issue in this
5  case has revealed at least 7,291 victims who paid by check into
6  the scheme.  However, the government believes that there were
7  even more victims than this number because it could not identify
8  and obtain all of the bank accounts associated with the scheme.
9  In addition, the government seized approximately seven boxes of
10 credit card slips that were associated with victims of the scheme
11 at a location in Atlanta.  A review of just one of these boxes
12 resulted in the creation of a spreadsheet that listed 1,023
13 victims of defendant Houston's offense.

14      The victims in this case were not only numerous, but the
15 evidence confirms that it was not infrequent for these victims to
16 be exploited on numerous occasions by defendant Houston and his
17 criminal partners.  Indeed, the lists of the victims generated in
18 this case, as well as the information that the government learned
19 through victim interviews and proffer interviews of defendant
20 Houston's co-conspirators, confirms that "reloading" (repeatedly
21 soliciting the same victim) was a "marketing technique" that was
22 used frequently by defendant Houston and those who he supervised.

23      Lastly, the victims in this case were vulnerable, as most of
24 them were quite elderly.  This assertion is supported by the
25 victim interviews that were conducted, a random review of law

26
27      [1]   As noted above, the victims in this fraudulent scheme
28 lost money by payments they made consisting of cash, checks, or
   via credit card.

enforcement databases that was conducted by the case agent to determine the dates of birth of defendant Houston's victims, and by information obtained as a result of proffer interviews of defendant Houston's co-schemers.

    3.   The Losses Attributable to the Massive Scheme Led By Defendant Houston Were Astronomical

There were a number of different company names associated with the lottery scheme at issue in this case, and each company utilized several different solicitation letters that were sent out to those who defendant Houston and his co-schemers victimized. Law enforcement has linked the following companies utilized during the scheme to defendant Houston:[2] (1) USA Group 21; (2) World Expert Fund; (3) Global Search Network; (4) Old Amsterdam Trust; (5) Mutual Medical Insurance; (6) Euro American Fax; (7) German Swiss Group; (8) Worldwide Verification Service; (9) The Shamrock Agency; (10) European Union Fulfillment Commission; (11) Sweepstakes Monitoring; (12) European Union Commission; (13) North American Players; and (14) New Jersey Investments. The losses attributable to each of these companies is estimated to be approximately $26,472,203.53. The following

---

[2]    Although defendant Houston was not completely in charge of some of these companies toward the end of the scheme, law enforcement believes that he still profited and received money from each of these fraudulently created companies, even after he and his son, defendant Vleisides, parted company toward the end of the scheme. Furthermore, it should be noted that the money obtained from the scheme was comingled by defendant H. Waither, and thus it is virtually impossible to determine the exact amount of money obtained by any of the defendants or a specific company during the course of the scheme.

is a breakdown of these estimated losses by company[3]:

| COMPANY | LOSS AMOUNT |
| --- | --- |
| USA GROUP 21 | $931,480.46 |
| WORLD EXPERT FUND | $9,680,642.85 |
| GLOBAL SEARCH NETWORK | $4,983,371.26 |
| EURO AMERICAN FAX | $3,717,713.32 |
| OLD AMSTERDAM TRUST | $406,254.56 |
| MUTUAL MEDICAL INSURANCE | $230,880.47 |
| GERMAN SWISS GROUP | $1,120,357.00 |
| WORLDWIDE VERIFICATION SERVICE | $1,318,348.68 |
| THE SHAMROCK AGENCY | $2,499,456.32 |
| SWEEPSTAKES MONITORING | $224,339.46 |
| EUROPEAN UNION COMMISSION | $32,574.57 |
| EUROPEAN UNION FULLFILLMENT COMMISSION | $385,769.18 |

---

[3] The amounts listed below are based on the deposits into the various bank accounts for these companies reviewed from the period of 2000 to 2006.  Since there were transfers of money between the accounts throughout the course of the scheme, some of the amounts cited herein may have been double-counted; however, in assembling this information, law enforcement did their best to not include such transfer amounts when reaching the totals reflected below.  Moreover, this analysis does not include three companies -- North American Foreign Payment Services, EU American Payment Service, and USA Payment Service – which defendant Houston and his co-schemers appear to have set up for the exclusive purpose of making payouts designed to give the scheme an air of credibility and to perpetuate the scheme, as no victim monies were deposited directly into these accounts.  Finally, the totals reflected herein may underrepresent the losses attributable to the scheme, as law enforcement has not been able to obtain and analyze all of the bank accounts used by all of the relevant companies during the course of the scheme, including some bank accounts that were maintained by the members of the scheme in Costa Rica.

```
1   NORTH AMERICAN PLAYERS              $737,311.36

2   NEW JERSEY INVESTMENTS              $203,704.04

3   TOTAL ESTIMATED LOSSES:            $26,472,203.53
```

III.

THE SENTENCING GUIDELINE CALCULATIONS

The government has not identified any factual objections or corrections to the PSR, apart from those noted here.  The government submits that the proper, albeit conservative, application of the Sentencing Guidelines in this case is as follows:

Base Offense Level:      7      [U.S.S.G. Section 2B1.1]

Specific Offense Characteristics

Loss Amount:            +20    Conservatively estimated between $14 and $20 million, with the caveat that this loss amount is likely understated

                               [U.S.S.G. Section 2B1(b)(1)(J)]

Offense involved 50 or more Victims     +6    [U.S.S.G. Section 2B1.1(b)(2)(B)]

A Substantial Part of the Fraud Was Committed Outside of the United States     +2    [U.S.S.G. Section 2B1.1(b)(8)(B)]

Offense Victimized Vulnerable Victims     +2    [U.S.S.G. Section 3A1.1(b)(1)]

Downward Adjustments

Acceptance of Responsibility     -3    [U.S.S.G. Section 3E1.1(b)]

Total Adjusted Offense Level     34

At criminal history category I, and offense level 34, the

government submits that defendant Houston's Sentencing Guideline range, which generously does not include any upward adjustment for defendant Houston's leadership role in the offense, is 151 months to 188 months imprisonment.  For the reasons explained below, the government is recommending that defendant Houston be sentenced to at least 120 months imprisonment, a sentence below this recommended Guideline range and even below the well-reasoned recommendation offered by the Probation Office in this case.

                                    IV.

                                 ARGUMENT

A.   A SENTENCE OF AT LEAST 120 MONTHS IS APPROPRIATE IN THIS
     CASE UPON CONSIDERATION OF THE FACTORS CITED UNDER
     18 U.S.C. § 3553(a)

     Pursuant to the Supreme Court's directive in <u>United States v. Booker</u>, 543 U.S. 220 (2005), this Court is required to consider all of the factors under 18 U.S.C. § 3553(a) to determine an appropriate sentence in this case.  Thus, in addition to considering the sentence yielded by an application of the advisory Sentencing Guidelines to this case, "the nature and circumstances of the offense," and "the history and characteristics of the defendant," this Court must also consider, among other things, whether a particular sentence it is prepared to impose (1) reflects the seriousness of the defendant's offense, promotes respect for the law, and provides just punishment for defendant's offense; (2) satisfies the goals of specifically and generally deterring the criminal conduct defendant committed in the instant case; and (3) is needed to protect the public.  Taking these factors into consideration, the government believes that a sentence of no less than 120 months is

                                    11

a sentence at the lowest range of what should be deemed
appropriate punishment for defendant Houston's conduct in this
case.

1. <u>A Sentence of at Least 120 Months Is Warranted to
Reflect the Nature and Seriousness of Defendant
Houston's Offense</u>

Defendant Houston's crimes were extremely serious and caused
the widespread victimization of tens of thousands of people, many
of whom -- elderly and living on a fixed income -- sent their
scarce funds to defendant Houston and his co-schemers in the
false belief that they were creating annuities for their children
and grandchildren.  Defendant Houston engaged in this conduct for
at least 16 years, creating a number of fraudulent lottery and
pension companies with his co-conspirators, and continuing the
scams on his own until his illegal conduct was exposed in 2006.
In total, defendant Houston and his co-schemers robbed their
victims of an excess of $20,000,000.  In light of this obscenely
aggravating set of facts, the seriousness of defendant Houston's
offense cannot be overstated, and a sentence of at least 120
months provides appropriate and just punishment and promotes
respect for the law.

2. <u>An Examination of the History and Characteristics of
Defendant Houston Favors the Imposition of a
Sentence of at Least 120 Months</u>

There is nothing about the history and characteristics of
defendant Houston that are particularly mitigating (and to the
extent defendant Houston argues otherwise, those issues are
addressed below).  Although defendant Houston has not previously
been convicted of a crime, the evidence in this case makes clear
that he has lived a substantial portion of his life as a con man

1  of the highest order.  Indeed, as noted by the Probation Office,

2  his criminal conduct in this case alone spans at least 16 years.[4]

3       Moreover, the information in the PSR confirms that defendant

4  Houston's illegal activities were not confined to the

5  victimization of the many thousands of victims, including the

6  elderly, via the massive fraud at issue in this case; defendant

7  Houston also abused illegal substances.  Indeed, by defendant

8  Houston's own admission, in the ten years prior to his arrest, he

9  used marijuana on a weekly basis and abused powder and crack

10 cocaine on a monthly basis.  (PSR ¶ 56).

11      In short, defendant Houston's "history and characteristics"

12 as an individual are defined by shadiness and criminality.  A

13 word processing document seized from the possession one of

14 defendant Houston's co-schemers, which describes the scheme at

15 issue in this case and defendant Houston's place in that scheme,

16 puts it best.  This document seized from the residence of Scott

17 Walther -- a document Mr. Walther obviously never believed would

18 land in the hands of law enforcement -- reads as follows:

19          This is fraud that has been going on for many years.
            Millions of dollars have been stolen from people that
20          cannot afford it.  The mailings originate from Little

21

22      [4]    Even when provided a chance to explain his employment
    history as an adult, defendant Houston has left the subject a
23  mystery, confirming that his involvement in the fraudulent scheme
    at issue in this case dominated his existence for many years.  He
24  refused to identify his employment to the Probation Office for
    the period encompassing the past 11 years; he has made the
25  unverified claim that he worked as a "website designer" at a
    salary of $7 per hour in Costa Rica between 1995 and 2000, when
26  he was actively involved in operating the fraudulent scheme at
    issue in this case; and he has provided no information to the
27  Probation Office concerning his employment during the 15 year
    period stretching from 1980 to 1995.  (PSR ¶¶ 61-63).
28

                              13

Rock, AR – cancelled at 722.   The mail then goes to . . . Amsterdam in the Netherlands.   From there it is sent by DHL to . . . Costa Rica.   Atlas Informaticos to be held for pick up at the DHL office . . . The master mind [sic] behind this scam is James Ray Houston apx. 60 years old.   He gained fame in 1974 when he ran for Governor in Nevada.   His accomplice is Sonny Vleisides apx. 30 years old.   Both from Kansas City originally . . . However, these guys are very slick and try very hard not put their names on anything.   A Russian by the name of Mikhsil Larguine has been used as Houston's front man for most of the 10 years plus that Houston has been in Costa Rica.   Houston has used many aliases over the years.   Rex Rogers was the longest lasting . . ."

(Criminal Complaint at ¶ 8(a)(i)).

> 3.   <u>The Advisory Sentencing Guidelines Support a Sentence of Greater than 120 Months</u>

Although the Sentencing Guidelines are not binding, the law provides that sentencing courts must start with the sentence advised by the Sentencing Guidelines at the time they determine an appropriate sentence.   <u>Booker</u>, 543 U.S. at 264 ("The district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing"); <u>United States v. Cantrell</u>, 433 F.3d 1269, 1279 (9th Cir. 2006) (stressing that "district courts still must consult the Guidelines and take them into account when sentencing, even though they now have the discretion to impose non-Guidelines sentences").   Thus, the "starting point" in this case in determining the appropriate sentence is the advisory Sentencing Guideline range of 151 to 188 months imprisonment.[5]   Accordingly,

---

[5]   This "starting point" relied upon by the government and the Probation Office itself appears to quite clearly understate the severity of defendant Houston's crimes, as the Sentencing Guideline calculation yielding a sentencing range of 151 to 188 months (a) assumes that the losses attributed to his offense were less than $20 million when they were almost certainly greater

14

a sentence as low as 120 months would constitute a substantial break from the "starting point" recommended as a result of an application of the Sentencing Guidelines to this case.

    4.  <u>A Sentence of at Least 120 Months Would Also Serve the Statutory Goals of Providing General Detterence, Adequate Detterance, and Protecting the Public from Further Harm</u>

In light of the enormity of the fraud at issue in this case, and the incredible amount of money that defendant Houston and his co-schemers reaped as a result of these crimes, the imposition of a sentence of at least 120 months would be fully consistent with the goal of deterring others tempted to engage in such behavior. The government further submits that such a sentence would serve the statutory goals of specifically deterring defendant Houston from engaging in further fraudulent conduct and protecting the public from further crimes committed by defendant Houston. Although defendant Houston has now expressed some degree of remorse for his actions, the fact remains that fraud appears to have been his sole (and highly profitable) livelihood for many years. Accordingly, this Court need not accept defendant Houston's eleventh-hour contrition at face value and should justifiably be concerned that defendant Houston would, upon release from the sentence he requests, resume the criminal lifestyle at which he has proven himself so experienced and adept.

---

than that; and (b) this range fails to account in any way for the role that defendant Houston played as an organizer, leader, or manager of the massive fraud at issue. A more aggressive, but frankly more accurate, calculation of defendant Houston's Sentencing Guideline range could yield a sentence as high as 292 to 365 months imprisonment.

B.   DEFENDANT'S SINGLE OBJECTION TO THE SENTENCING GUIDELINE
     CALCULATION OFFERED BY THE PROBATION OFFICE IS WITHOUT
     MERIT

     In his sentencing position paper, defendant Houston offers a
single objection to the Sentencing Guideline calculation arrived
at by the Probation Office, summarily arguing that this court
should not impose the two-level enhancement pursuant to USSG
§ 2B1.1(b)(9)(B) recommended by the Probation Office to account
for the fact that a substantial part of the fraudulent scheme at
issue in this case was committed from outside the United States.
This objection is without merit.

     Section 2B1.1(b)(9)(B) of the United States Sentencing
Guidelines provides for a two offense level increase under the
Guidelines where "a substantial part of a fraudulent scheme was
committed from outside of the United States."  There is little
doubt that this Guidelines enhancement applies in this case.
Defendant Houston, as well as his son, Vleisides, operated the
scheme from Costa Rica, where they lived during a large period of
time encompassing the scheme; the victims sent money to mail
drops established by defendant Houston and his co-schemers in the
Netherlands and Ireland, among other locations; the ill-gotten
gains in this case were laundered from, among other places, Los
Angeles, to among other places, Costa Rica, so defendant Houston
could utilize them; and the checks offered by the victims of the
fraudulent scheme operated by defendant Houston were initially
sent out of the United States in an attempt to legitimize the
scheme.  As a result of these facts, and others, this enhancement

16

1  plainly applies in this case.[6]

2  C.   THE MITIGATING FACTS RELIED UPON BY DEFENDANT HOUSTON IN HIS
          SENTENCING BRIEF DO NOT JUSTIFY SLASHING DEFENDANT HOUSTON'S
3          SENTENCE TO ONE-THIRD THE SENTENCE RECOMMENDED BY THE
          PROBATION OFFICE IN THIS CASE

4
          In an effort to obtain a sentence less than one-third the
5
   length recommended by the Probation Office in this case,
6
   defendant Houston relies essentially on arguments, all of which
7
   were considered by the Probation Office in reaching its
8
   recommendation: (1) the argument that a lenient sentence is
9
   justified as a result of his "history and characteristics"; (2)
10
   the argument that a lenient sentence is justified due to his
11
   current medical condition; and (3) the argument that a sentence
12
   of 51 months is justified to avoid an unwarranted sentencing
13
   disparity between defendant Houston and his co-defendants.  None
14
   of these arguments justify the sentence defendant Houston seeks.
15
          1.   Defendant Houston's "History and Characteristics" Do
16               Not Justify a Sentence of 51 Months

17       While defendant Houston asserts that his "history and

18  characteristics" merit leniency in this case, he offers no

19  convincing facts in support of this argument, apart from a

20  description of events that took place decades ago, and the

21  assertion that "up until his involvement in the instant offense"

22  defendant Houston has shown "great respect for the law."  As

23  _____

24       [6]    Indeed, this enhancement was recommended in the
   Presentence Reports prepared in connection with the sentencings
25  of defendant Houston's co-schemers -- defendants Cloud, Emmett,
   and Vleisides -- and this Court imposed this enhancement, without
26  objection from the defense, in each one of these cases.  It makes
   no logical sense why this enhancement would not be equally
27  applicable to defendant Houston, particularly given the fact that
   he operated the scheme, in large measure, from a foreign country.
28

1  discussed above, the fraud at issue in this case which defendant

2  Houston led, spanned 16 years and involved defrauding tens of

3  thousands of victims, including the infirm and the elderly, out

4  of astronomical amounts of money.  To the extent it is even true

5  that defendant Houston showed "great respect for the law" more

6  than 20 years ago, it is difficult to understand how that merits

7  any leniency when he is sentenced now.

8      2.  <u>Defendant Houston's Medical Issues Do Not Justify
          the Sentence He Advocates</u>

9

10  Defendant Houston also asserts that he is entitled to

11  substantial leniency from this Court in light of his medical

12  condition.[7]  However, defendant Houston has failed to meet both

13  of the criteria that he should be required to meet in order to

14  qualify for the extreme leniency he seeks based on his medical

15  condition:  He has arguably failed to show that his medical

16  condition is extraordinary, and he certainly cannot show that the

17  BOP will be unable to provide for his medical needs during his

18  incarceration.

19      The government recognizes that given the non-binding nature

20  of the Guidelines in the wake of the <u>Booker</u> decision, the issue

21  of what impact, if any, a defendant's medical condition should

22  play in determining a defendant's sentence is not simply a matter

23  of determining whether a defendant should receive a departure

24  from his otherwise applicable Guidelines range.  Nevertheless,

25  prior court decisions examining whether a defendant should

26  _____

27  [7]   Defendant Houston asserts that he has been diagnosed
       with a variety of ailments, including Parkinson's Disease in
28  2005, and that he has suffered from three strokes since
       approximately 2008.

18

1  receive a downward departure based on his alleged medical
2  problems are instructive when attempting to determine whether a
3  recommended sentence is "reasonable" following consideration of
4  the factors set forth in 18 U.S.C. § 3553(a). These decisions
5  reflect the logical conclusion that a defendant should not be
6  entitled to a reduction from a sentence he would otherwise face
7  unless (1) the defendant can show that he suffers from an
8  "extraordinary" medical condition; and (2) the defendant can show
9  that he should not be incarcerated for a particular length of
10 time, or even at all, because the BOP cannot adequately provide
11 for his medical needs. See e.g., United States v. Martinez-
12 Guerrero, 987 F.2d 618, 620 (9th Cir. 1992). Defendant has
13 failed to make both of these showings.

14     First, while it appears clear that defendant's medical
15 problems plague him on a daily basis and require extensive
16 oversight by a physician, they arguably do not fall into the
17 category of what courts have considered "extraordinary" medical
18 problems justifying a more lenient sentence than that called for
19 under the Guidelines. To the contrary, defendant's medical
20 problems, while serious, are comparable with the medical problems
21 faced by other defendants who have been denied downward
22 departures to account for their medical condition. See Martinez-
23 Guerrero, 987 F.2d at 660-21 (defendant's blindness did not
24 constitute an "extraordinary physical impairment" that warranted
25 a downward departure); United States v. Lujan, 324 F.3d 27, 31
26 (1st Cir. 2003) (reversed on other grounds) (affirming a district
27 court's refusal to grant a downward departure based on a claimed
28 extraordinary physical impairment in a case where the defendant

1  had only one kidney, suffered from cirrhosis and calcified

2  arteries, and had a demonstrated history of heart disease);

3  United States v. Johnson, 318 F.3d 821, 823-25 (8th Cir. 2003)

4  (holding that a district court abused its discretion when it

5  granted a downward departure based on extraordinary physical

6  impairment for a defendant who suffered from coronary heart

7  disease and Hodgkin's disease, two "potentially life-threatening

8  health problems"); United States v. Carr, 271 F.3d 172, 176-77

9  (4th Cir. 2001) (affirming district court's refusal to grant a

10  downward departure on basis of extraordinary physical impairment

11  for defendant who suffered from acquired immune deficiency

12  syndrome); United States v. Tyler, 125 F.3d 1119, 1123 (7th Cir.

13  1997) (30-year-old polio patient who suffered a heart attack due

14  to coronary artery occlusion, requiring bypass surgery, not

15  entitled to a departure based on his medical condition).

16       Second, defendant Houston has entirely failed to show that

17  the BOP will be unable to accommodate his medical condition once

18  he is incarcerated and that he should receive a lesser sentence

19  than otherwise appropriate as a result.  In this regard, there is

20  little question that the BOP can address defendant Houston's

21  medical issues while he is custody.  Indeed, it is likely safe to

22  assume that defendant Houston is receiving medical care that is

23  equal to or superior to the care that he received in Costa Rica

24  when he was suffering from his various medical problems during

25  the years he was a fugitive in this case.

26       Accordingly, to the extent defendant Houston's medical

27  condition warrants the imposition of a sentence below the 151

28  month sentence recommended by the Probation Office, it does not

20

1  warrant a sentence below the range starting at 120 months

2  recommended by the government.

3       3.   Defendant Houston is Not Entitled to a Massive
            Sentencing Reduction to Account for the Sentences the
4            Lesser Culpable Co-Schemers in this Case Received

5       Finally, defendant Houston asserts that a 51-month sentence

6  is warranted in his case to "avoid unwarranted sentence

7  disparities" between his sentence and the sentences received by

8  his co-defendants.   This argument -- which the Probation Officer

9  has explicitly rejected in making its recommendation -- is

10 without merit.

11      First, defendant Houston's argument is legally flawed.   As

12 the Ninth Circuit has previously recognized on a number of

13 occasions, a sentencing judge is under no obligation to equalize

14 sentences among co-conspirators or co-defendants.   See, e.g.,

15 United States v. Monroe, 943 F.2d 1007, 1017 (9th Cir. 1991)

16 (rejecting argument that a district court must provide equalized

17 sentences among co-defendants under the Guidelines or 18 U.S.C.

18 § 3553(a)(6) and holding that a district court is not even

19 required to provide an explanation to justify any sentencing

20 disparity between co-defendants, except in the limited case where

21 it can be questioned whether a defendant was improperly penalized

22 for exercising his constitutional right to a jury trial); United

23 States v. Endicott, 803 F.2d 506, 510 (9th Cir. 1986)

24 (recognizing that "[i]t is within the discretion of the trial

25 court to impose disparate sentences upon co-defendants" and that

26 a disparity in the sentences imposed upon co-defendants does not

27 indicate that the sentencing judge has abused his discretion or

28 that appellate review of that decision is warranted).

1    Moreover, 18 U.S.C. § 3553(a)(6) -- which requires courts to
2    "avoid unwarranted sentence disparities among defendants with
3    similar records who have been found guilty of similar conduct"
4    and is just <u>one</u> of the sentencing considerations set forth at
5    18 U.S.C. § 3553(a) -- was enacted for the purpose of promoting
6    <u>national uniformity</u> at sentencing among equally-situated
7    defendants and not to achieve sentencing parity among co-
8    defendants in a particular case.  <u>See</u> <u>United States v. Saeteurn</u>,
9    504 F.3d 1175, 1181 (9th Cir. 2007).  Accordingly, since
10   defendant Houston has not shown and cannot show that defendants
11   across the nation typically receive sentences of less than five
12   years for engaging in widespread fraud for 16 years that
13   victimizes thousands of victims to the tune of at least $20
14   million, defendant Houston has not shown and cannot show that he
15   is entitled to a sentence on par with the sentences received by
16   his co-defendants.

17   In addition, as the Probation Office has recognized (and
18   factored into its recommendation), the disparity between the
19   sentence it has recommended in defendant Houston's case, as
20   compared to the sentences received by his co-defendants, is
21   entirely warranted because defendant and his co-defendants were
22   not "similarly situated" and demanding of equal treatment at
23   sentencing.  Defendant Houston's involvement in the scheme at
24   issue in this case spanned a longer period of time than the
25   involvement of his co-defendants; defendant Houston served as the
26   organizer and leader of the scheme; and there are a plethora of
27   other reasons why defendant Houston's co-defendants received the
28   sentences that they did which are not applicable to defendant

22

1   Houston.[8]  Accordingly, the Probation Office is correct in its

2   assertion that the disparity between even a 151-month sentence in

3   defendant Houston's case and the sentences received by his co-

4   defendants is amply justified by the facts of this case.

V.

CONCLUSION

7   For each of the foregoing reasons, the government recommends

8   that defendant Houston be sentenced to at least a 120 month

9   period of imprisonment to be followed by a three year period of

10  supervised release subject to each of the conditions recommended

11  by the Probation Office.

12  DATED: July 15, 2011

Respectfully submitted,

ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division

Attorneys for Plaintiff
UNITED STATES OF AMERICA

_____

[8]    For instance, unlike defendant Houston, defendants
Vleisides, Emmett, and H. Walther cooperated with the government
following their arrests and received consideration at sentencing
for their cooperation.  Indeed, in the case of defendant Emmett,
the defendant in this case who was probably closest in
culpability to defendant Houston, the government recommended that
his cooperation be rewarded in the form of a six-level downward
departure from his otherwise applicable Sentencing Guideline
offense level, a recommendation this Court adopted.  Defendant
Cloud, the other defendant Houston cites in his position paper,
played a very marginal role in the offense at issue in this case,
certainly when compared to the role that defendant Houston
played, and the sentence he received is practically immaterial to
this discussion as a result of the differing roles he and
defendant Houston played in the offense.

23

## CERTIFICATE OF SERVICE

I, **Shaton L. McDaniel**, declare:

That I am a citizen of the United States and resident or employed in Los Angeles County, California; that my business address is the Office of United States Attorney, United States Courthouse, 312 North Spring Street, Los Angeles, California 90012; that I am over the age of eighteen years, and am not a party to the above-entitled action;

That I am employed by the United States Attorney for the Central District of California who is a member of the Bar of the United States District Court for the Central District of California, at whose direction I served a copy of:

**GOVERNMENT'S SENTENCING POSITION REGARDING THE SENTENCING OF DEFENDANT JAMES RAY HOUSTON AND RESPONSE TO DEFENDANT HOUSTON'S SENTENCING PAPER**

service was:

[xx]  Placed in a closed
      envelope, for collection
      and interoffice delivery
      addressed as follows:

[ ]   Placed in a sealed
      envelope for collection and mailing
      via United States Mail,
      addressed as follows:

[ ]   By hand delivery
      addressed as follows:

[ ]   By facsimile as follows:

[ ]   By messenger as follows:

[ ]   By federal express as follows:

[ ]   By email as follows:

**LORI PASCOVER**
United States Probation Officer
6th Floor

This Certificate is executed on July 15, 2011 at Los Angeles, California.
I certify under penalty of perjury that the foregoing is true and correct.

_____
Shaton L. McDaniel